UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RHONA M. WILSON, *Individually and as Administratrix of the Estates of Horace N. Wilson, Deceased; Darren N. Wilson, Deceased; and Shane N. Wilson, Deceased,* | : : : : : : : | **CIVIL NO. 1:04-CV-1271** |
| AND | : : | |
| VIVIA JOSEPH and DONALD ST. PATRICK TAYLOR, Co-Administrators of the Estate of CHRISTOPHER TAYLOR, deceased, | : : : : : : | (Magistrate Judge Smyser) |
| v. | : : | |
| IESI NY CORPORATION and EMERALD ISLE TRANSPORT, INC. d/b/a K & G HAULING and RHONA WILSON, Administratrix of the Estate of HORACE WILSON, deceased | : : : : : : : : | |

(Magistrate Judge Smyser)

**FILED**
HARRISBURG, PA

JUL 28 2006

MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

**MEMORANDUM AND ORDER**

I. Background and Procedural History.

The complaint in this case was filed on June 10, 2004.
The case is a wrongful death, survival and negligence action
arising from a truck and automobile collision resulting in

fatalities that occurred in Cumberland County, Pennsylvania on July 18, 2003.

The plaintiff in the original complaint is Rhona M. Wilson, individually and as the administratrix of the estates of Horace N. Wilson, Darren N. Wilson and Shane N. Wilson. Horace N. Wilson was the plaintiff's husband. Darren N. Wilson and Shane N. Wilson were her sons. The defendants are IESI NY Corporation and Emerald Isle Transport, Inc. Both defendants are alleged to be registered interstate federal motor carriers. The truck that collided with the Wilsons' automobile is alleged to have been owned or leased by defendant Emerald and driven by Merdado F. Jama. It is alleged in the complaint that Emerald was engaged in the hauling of municipal solid waste pursuant to an agreement with IESI, and more specifically that Emerald picked up solid waste for hauling at transfer stations owned and operated by IESI and hauled the waste to solid waste landfills designated by IESI.

The complaint contains wrongful death claims on behalf on the estates of Horace N. Wilson (Count I), Darren N. Wilson (Count II) and Shane N. Wilson (Count III); survival claims on behalf of the three estates (Counts IV, V and VI); and

2

negligence, loss of consortium and negligent infliction of emotional distress claims of plaintiff Rhona M. Wilson (Counts VII, VIII and IX).

On July 13, 2004, defendant IESI NY Corp. answered the complaint and filed a four count cross-claim against defendant Emerald Isle.  By an Order dated January 25, 2005, counts III and IV of IESI's cross-claim against Emerald Isle were stricken.

On August 16, 2004, defendant Emerald Isle filed an answer to the complaint and a counterclaim against plaintiff Wilson individually and as administratrix of the estate of Horace Wilson.

On October 18, 2004, defendant IESI filed a motion for summary judgment, and on November 17, 2004, the plaintiff filed a cross motion for summary judgment against defendant IESI.  By a Memorandum and Order dated January 25, 2005, the court denied defendant IESI's motion for summary judgment.  The court granted the plaintiff's motion for summary judgment on the issue of defendant IESI's vicarious liability if negligence on the part of the driver of the truck is established.  The court

3

held as a matter of law that defendant IESI is deemed to be the statutory employer and lessee of defendant Emerald Isle and its driver pursuant to the Federal Motor Carrier Safety Regulations.  Defendant IESI filed a motion for the court to certify the January 25, 2005 order as an interlocutory appealable order.  By an Order dated February 18, 2005, the court granted that motion.  However, the United States Court of Appeals for the Third Circuit denied IESI's petition for permission to appeal.

On April 29, 2005, Vivia Joseph and Donald St. Patrick Taylor, co-administrators of the estate of Christopher Taylor, filed an interpleader complaint against IESI, Emerald Isle and Rhona Wilson in her capacity as the administratrix of the Estate of Horace Wilson.  Christopher Taylor was a passenger in the Wilson vehicle and was killed in the collision.  Count I of the Taylor complaint is a wrongful death claim and Count II is a survival claim.

Defendant IESI filed an answer to the Taylor complaint and cross-claims against Emerald Isle and Rhona Wilson in her capacity as administratrix of the Estate of Horace Wilson. Defendant Emerald Isle filed an answer to the Taylor complaint

4

and a cross-claim against Rhona Wilson in her capacity as the administratrix of the Estate of Horace Wilson.  Rhona Wilson in her capacity as administratrix of the Estate of Horace Wilson filed an answer to the Taylor complaint and cross-claims against IESI and Emerald Isle.

The parties consented to proceed before a magistrate judge pursuant to 28 U.S.C. § 636(c).  The case is scheduled for a jury trial beginning on September 18, 2006.

On May 15, 2006, defendant IESI filed a motion for reconsideration of the Court's January 25, 2005 Order denying its motion for summary judgment and granting summary judgment to plaintiff Wilson on the issue of IESI's vicarious liability for any negligence on the part of the driver of the truck.  On May 15, 2006, defendant IESI also filed a brief in support of its motion for reconsideration and a separate motion for summary judgment on the Taylor claims.  Defendant IESI is seeking to have the court reconsider its decision that IESI  is deemed to be the statutory employer and lessee of defendant Emerald Isle and its driver pursuant to the Federal Motor Carrier Safety Regulations.  Defendant IESI contends that it was not a lessee of Emerald Isle, that Emerald Isle was an

independent contractor, and that, therefore, it is not vicariously liable for any negligence on the part of Emerald Isle or its driver.  Defendant IESI is seeking summary judgment in its favor on the basis that it is not vicariously liable for any negligence on the part of Emerald Isle or its driver.

Plaintiff Wilson filed a motion to deny defendant IESI's motion for reconsideration or, in the alternative, for an enlargement of time to respond to the motion for reconsideration.  The Taylor plaintiffs filed a motion to strike defendant IESI's motion for reconsideration and motion for summary judgment or, in the alternative, for an enlargement of time to respond to those motions.  By an Order dated May 23, 2006, the plaintiffs' motions were granted in part and denied in part.  The plaintiffs were granted an enlargement of time until June 25, 2006 to respond to defendant IESI's motions, but the plaintiffs' motions were otherwise denied.

Defendant IESI's motion for reconsideration and motion for summary judgment have been briefed and will be considered in this memorandum and order.

II.   Motion for Reconsideration.

We will first consider defendant IESI' motion for reconsideration of the Order of January 25, 2005.

"The purpose of a motion for reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence." *Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 909 (3d Cir. 1985).  A district court may grant a party's motion for reconsideration when there exists: "(1) the development of an intervening change in the law, (2) the emergence of new evidence not previously available, or (3) the need to correct a clear error of law or prevent a manifest injustice." *Cohen v. Austin*, 869 F. Supp. 320, 321 (E.D.Pa. 1994).  If there is no new evidence or no clear error of law, the motion should be denied. *Clifford v. Jacobs*, 739 F. Supp. 957, 958-59 (M.D.Pa. 1990).  Mere disagreement with the court does not translate into a clear error of law. *Petruzzi's, Inc. v. Darling-Delaware Co., Inc.*, 983 F.Supp. 595, 611 (M.D. Pa. 1996).  "A motion for reconsideration is not a tool to relitigate and reargue issues which have already been considered and disposed of by the court." *Id.*  "Nor is it to be used to put forth additional arguments which could have been

made but which the party neglected to make before judgment.
*Waye v. First Citizen's Nat'l Bank*, 846 F.Supp. 310, 314 (M.D.
Pa. 1994), *aff'd*, 31 F.3d 1175 (3d Cir. 1994).  In the interest
of finality, courts should grant motions for reconsideration
sparingly. *Rottmund v. Continental Assurance Co.*, 813 F. Supp.
1104, 1107 (E.D.Pa. 1992).

Because we conclude that we erred in holding that
defendant IESI is the statutory employer and lessee of
defendant Emerald Isle and its driver pursuant to the Federal
Motor Carrier Safety Regulations, we will grant IESI's motion
for reconsideration and we will reconsider the issue of whether
IESI is vicariously liable for any negligence on the part of
the truck driver.  We will reconsider that issue in the context
of defendant IESI's request for summary judgment.

III.  Defendant IESI's Requests for Summary Judgment.

Defendant IESI's filed a motion seeking summary
judgment against the Taylor plaintiffs.  Defendant IESI also
seeks summary judgment against plaintiff Wilson as part of its
motion for reconsideration.  Since the issues are the same with
regard to both plaintiffs, we will consider defendant IESI'

requests for summary judgment against plaintiff Wilson and the Taylor plaintiffs at the same time.

A. Summary Judgment Standard.

Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact, though the non-moving party must make a showing sufficient to establish the existence of each element of his case on which he will bear the burden of proof at trial." *Huang v. BP Amoco Corp.*, 271 F.3d 560, 564 (3d Cir. 2001); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

"A factual dispute is material if it bears on an essential element of the plaintiff's claim, and is genuine if a reasonable jury could find in favor of the nonmoving party." *Natale v. Camden County Correctional Facility*, 318 F.3d 575, 580 (3d Cir. 2003). In determining whether an issue of

material fact exists, the court must consider all evidence in the light most favorable to the non-moving party. *White v. Westinghouse Electric Co.*, 862 F.2d 56, 59 (3d Cir. 1988). "Our function at the summary judgment stage is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Federal Home Loan Mortgage Corp. v. Scottsdale Ins. Co.*, 316 F.3d 431, 443 (3d Cir. 2003).

B. Motor Carrier Safety Regulations.

In the Order of January 25, 2005, the court held as a matter of law that defendant IESI is deemed to be the statutory employer and lessee of defendant Emerald Isle and its driver pursuant to the Federal Motor Carrier Safety Regulations. Defendant IESI asserts that that ruling was incorrect and that it was not a lessee of Emerald Isle because the leasing provisions of the Motor Carrier Act and regulations thereunder are only triggered where regulated property is transported interstate and because garbage is not considered property under the Act. Defendant IESI also contends that the leasing provisions do not apply to it because those provisions apply to motor carriers, because it owned the garbage that was

10

transported and, therefore, because it was a private carrier or a shipper, rather than a motor carrier.

Congress enacted the Motor Carrier Act (MCA) in 1935. *See* William E. Kenworthy, *Transportation Safety and Insurance Law* §4.01 (3rd ed. 2005). The Act endowed the Interstate Commerce Commission (ICC) "with the power to impose economic regulations such as licensing, certificate, and permit requirements on common and contract carriers, but not on private carriers." *Bilyou v. Dutchess Beer Distributors, Inc.*, 300 F.3d 217, 227 (2nd Cir. 2002). "However, while private carriers were exempt from the economic and licensing regulations established by the MCA, the ICC retained the authority under the Act to prescribe safety of operation requirements relating to the maximum hours and qualifications of their employees." *Id*. "In 1966, Congress enacted the "Department of Transportation Act," which transferred the authority to regulate safety operations for motor vehicles under the MCA from the ICC to the Department of Transportation." *Id*. at 222 n.2. "[T]he ICC retained responsibility for determining the fitness of common and contract carriers." Kenworthy, *supra* §4.02. "Congress abolished the ICC on January 1, 1996 and transferred many of

11

its functions to the newly created Surface Transportation Board, an agency within the Department of Transportation." *Id.*

Currently, under 49 U.S.C. § 13501, the Secretary of the Department of Transportation and the Surface Transportation Board have jurisdiction over transportation by motor carriers and the procurement of that transportation to the extent that passengers, property, or both are transported by motor carriers in interstate commerce. The Act defines a "motor carrier" as "a person providing commercial motor vehicle . . . transportation for compensation." 49 U.S.C. § 13102(14). The Act defines a "motor private carrier" as "a person, other than a motor carrier, transporting property by commercial motor vehicle . . . when – (A) the transportation is as provided in section 13501 of this title [49 USCS § 13501]; (B) the person is the owner, lessee, or bailee of the property being transported; and (C) the property is being transported for sale, lease, rent, or bailment or to further a commercial enterprise." 49 U.S.C. § 13102(15).

49 U.S.C. § 13901 provides that a person may provide transportation subject to jurisdiction under 49 U.S.C. § 13501 et seq. only if the person is registered to provide that

transportation. 49 U.S.C. § 13902 provides that the Secretary

shall register a person to provide transportation subject to

its jurisdiction under 49 U.S.C. § 13501 as a motor carrier if

the Secretary finds that certain conditions are met. 49 U.S.C.

§ 13902(a).


   The Act contains a provision regarding leased motor

vehicles which provides:

>       The Secretary may require a motor carrier
> providing transportation subject to
> jurisdiction under subchapter 1 of chapter 135
> [49 USCS §§ 13501 et seq.] that uses motor
> vehicles not owned by it to transport property
> under an arrangement with another party to -
> (1) make the arrangement in writing signed by
> the parties specifying its duration and the
> compensation to be paid by the motor carrier;
> (2) carry a copy of the arrangement in each
> motor vehicle to which it applies during the
> period the arrangement is in effect;
>  (3) inspect the motor vehicles and obtain
> liability and cargo insurance on them; and
>  (4) have control of and be responsible for
> operating those motor vehicles in compliance
> with requirements prescribed by the Secretary
> on safety of operations and equipment, and
> with other applicable law as if the motor
> vehicles were owned by the motor carrier.

49 U.S.C. § 14102(a).  Regulations under the Act provide that

an authorized carrier may perform authorized transportation in

equipment it does not own only under certain conditions

including that there be a written lease granting the use of the

13

equipment and which provides *inter alia* that the "authorized carrier lessee shall have exclusive possession, control, and use of the equipment for the duration of the lease" and that "the authorized carrier lessee shall assume complete responsibility for the operation of the equipment for the duration of the lease." 49 C.F.R. § 376.11 - 376.12. The regulations define an "authorized carrier" as a "person or persons authorized to engage in the transportation of property as a motor carrier under the provisions of 49 U.S.C. § 13901 and § 13902." 49 C.F.R. § 376.2(a).

Defendant IESI contends that the leasing provisions of the Motor Carrier Act and regulations thereunder are only triggered where regulated property is transported interstate and that garbage is not considered property under the Act.

The Act does not define the term property. The Act provides specific exemptions for certain commodities but garbage is not one those. *See* 49 U.S.C. § 13506. Common sense seems to suggest that garbage fits within the ordinary definition of property. Nevertheless, defendant IESI has cited cases which have concluded that garbage is not property within the meaning of certain other statutes. *See e.g. Rumpke*

14

*Container Service, Inc. v. Zaino*, 762 N.E.2d 995 (Ohio

2002)(holding that waste is not property under Ohio law).

Defendant IESI also cites the case of *Interstate Commerce*

*Commission v. Browing-Ferris Industries, Inc.* 529 F.Supp. 287

(N.D. Al. 1981), which held that non-radioactive hazardous

wastes are not property under the Act.  The *Browning-Ferris*

court based its holding on ICC decisions discussing what the

term "property" encompasses.  The court reviewed those ICC

decisions as follows:

> Several ICC decisions have discussed what
> "property" encompasses. The first was *Joray*
> *Trucking Corp. Common Carrier Application*, 99
> M.C.C. 109 (1965). Joray Trucking Corp. had
> sought authorization to transport rock and
> debris from excavation and demolition sites.
> The Commission stated:
>
>> Here, the debris, although it may
>> ultimately serve a purpose in
>> helping to fill wasteland, is not
>> purchased from the contractors who
>> desire its removal and to them it
>> has a negative value as a commodity,
>> as distinguished from sand and
>> gravel which are commodities having
>> exchangeable values. The contractors
>> are not concerned with any
>> beneficial ownership of the debris,
>> they do not select the destination
>> to which it is to be taken (they may
>> not even know where it will be
>> taken), and it would appear that
>> they relinquish any nominal
>> ownership of the commodity at the
>> time it is loaded and removed from
>> the demolition or excavation site.
>> Thus, we are inclined to conclude

> that the commodity does not have the
> attributes commonly associated with
> the word property.
> All things considered we believe
> that debris and rubble should not be
> considered property as affects the
> jurisdictional scope of the
> Interstate Commerce Act.
> For decisions holding that authority
> is not required for interstate
> transportation of garbage, refuse,
> and trash, see No. MC-123571 (Sub-
> No. 1), Wm. Helzer & Sons Contract
> Carrier Application (not printed),
> decided September 28, 1961, and No.
> MC-124133 (Sub-No. 2), Miller Common
> Carrier Application (not printed),
> decided September 21, 1962.

99 M.C.C. at 110-11 (footnote omitted). The
"negative value" of the commodity in *Joray* was
apparently a deciding factor in the
Commission's determination that the rock and
other debris did not constitute property.

A few years later, however, the
Commission found that radioactive wastes
constituted property despite the obvious
negative value of the commodity. *Long Island
Nuclear Service Corp. Common Carrier
Application*, 110 M.C.C. 398 (1969). The
Commission distinguished *Joray*:

> The contention that radioactive
> waste is without the attributes of
> the term "property" as used in the
> act is also predicated on the Joray
> case, ... wherein debris and rubble
> from demolition sites, in interstate
> motor movements in the New York City
> area, were not considered "property"
> insofar as jurisdiction under the
> act is concerned. The transportation
> was, therefore, found not to be
> covered by part II of the act. In
> interstate operations of essentially
> a local character such as the
> disposal of debris and rubble and

16

trash and garbage collection which
appear in marginal purview of the
remedial aims of the act, the
Commission has exercised discretion
in the administration of part II by
finding such items not to be
"property." A substantial and
different public interest, however,
inures to responsible for-hire
transportation of dangerous traffic
whether it be valuable nuclear fuel
or radioactive waste, particularly
in territorially extensive
operations. Similarly, the
transportation of explosives is
subject to appropriate operating
authority without distinction as to
whether, for example, a carrier may
be transporting obsolete munitions
which have no beneficial value or
economic use. The term "property" is
not defined in the act and is used
therein in its broadest context.
Accordingly, we discern no
discretion in administering the act
to exclude from our economic
regulation the transportation of
dangerous materials, albeit destined
for burial. Although we recognize
that the use of nuclear materials is
an infant industry which is the
subject of regulation by the AEC and
other agencies, the issuance of
authority to interstate motor
carriers transporting nuclear
commodities, including radioactive
waste, remains vested in this
Commission. We conclude that the
proposed operations require
appropriate operating authority, and
that the motion to dismiss should be
overruled.

110 M.C.C. at 403-04 (footnote omitted).

In *Long Island* the Commission stated that
the *Joray* decision hinged not so much on the

worthlessness of the commodity as on the local
character of the trucking company's disposal
of the debris "which appear in marginal
purview of the remedial aims of the act." *Id.*
Thus, the fact that the radioactive wastes in
*Long Island* were worthless was not
determinative, whereas the dangerousness of
the traffic was apparently the determining
factor. 110 M.C.C. at 404. The Commission
stated that the term "property" would be used
in its broadest context in order to encompass
the transportation of dangerous materials,
even if such materials have no beneficial
value or economic use. *Id.* Four commissioners
dissented in part, and two commissioners
dissented on the ground that *Long Island*
cannot be reconciled with *Joray* since
radioactive waste is at least as worthless as
garbage and consequently possesses none of the
attributes typically ascribed to property by
the Commission.

In fact, the Commission reversed itself
in *Nuclear Diagnostic Laboratories Contract
Carrier Application,* 129 M.C.C. 339 (1978)
(*Nuclear Diagnostic I*), finding that
radioactive wastes were not within the
regulatory jurisdiction of the ICC. The ICC
noted that the safety considerations expressed
in *Long Island* were adequately taken care of
by existing DOT and NRC regulations. 129
M.C.C. at 343-44.

Yet one year later, the Commission again
reversed itself holding that radioactive waste
material destined for burial is property
within the meaning of 49 U.S.C. § 10521.
*Nuclear Diagnostic Laboratories, Inc.,
Contract Carrier Application,* 131 M.C.C. 578
(1979) (*Nuclear Diagnostic II*). The Commission
concluded:

> Upon further reflection, we conclude
> that the economic value of hazardous
> materials, including radioactive
> waste destined for burial, should
> not be the sole criterion for
> determining whether these

18

commodities are "property" subject
to the general jurisdiction of the
Commission (49 U.S.C. § 10521).
"Property" is not defined in the
Interstate Commerce Act and, as we
noted in our prior report, the word
is subject to many different
meanings. "Property" connotes
ownership as well as value.
Something that is owned can be
"property" notwithstanding its lack
of economic value.
Our decision in *Joray Trucking Corp.
Common Carrier Application*, 99
M.C.C. 109 (1965) is not controlling
here. In that case, debris and
rubbish from demolition sites in the
New York City area were found not to
be "property" covered by the motor
carrier portion of the act. Joray's
operations, although interstate,
were essentially local in nature and
only marginally related to the
remedial aims of the act. By
contrast, a substantial and
different public interest is
involved here. Nuclear waste
materials are often transported over
long distances (as seen in this
application), they generate
significant public concern, and
carriers may consider them
unattactive (sic) commodities to
transport (*see Akron, Canton,
supra*). In order to ensure the
availability of economical
transportation of nuclear materials,
the Commission must retain
jurisdiction.

131 M.C.C. at 580-81. Plaintiff relies upon
this language for its contention that the
waste here involved is property. (Tr. 164-68).

The Commission has expanded and
contracted the waste classifications that
constitute property. It has not, however, held

19

that it has jurisdiction over non-nuclear
wastes that are not to be recycled or reused.
With respect to reusable waste products, the
Commission instituted a rulemaking proceeding
to develop special procedures for licensing
the transportation of reusable waste products.
*Ex Parte No. MC-85, Transportation of "Waste"
Products for Reuse and Recycling (General
Motor Carrier Licensing)*, 114 M.C.C. 92
(1971). The Commission recognized that an
extension of its economic regulation to
encompass certain types of waste products
necessitated a rulemaking proceeding:

> (W)e conclude that a rulemaking
> proceeding is not only desirable,
> but necessary in these
> circumstances.

*Id.* at 105. Of course, any proposed
regulations had to fall within the ICC's
jurisdiction, which was described thusly:

> This Commission, however, does not
> have the option of picking and
> choosing the commodities it will
> regulate. That is the province of
> the Congress which, by part II of
> the Interstate Commerce Act, has
> decreed that the for-hire motor
> transportation of "property" in
> interstate or foreign commerce, with
> specified exceptions not here
> relevant, shall be subject to full
> economic regulation by this
> Commission. The essential question
> is therefore whether the commodities
> here to be transported are in fact
> "property" for purposes of our
> jurisdiction. The transportation of
> trash and garbage, which has no
> property value, solely for the
> purpose of disposal is not subject
> to economic regulation by this
> Commission.

*Id.* at 104 (citation omitted) (emphasis
supplied).

Because they possess a "'negative' property value," the Commission specifically excluded waste products with no recycling potential:

> It is the purpose of this proceeding to remove any regulatory hindrances to the rendition of such transportation services on an efficient and economical basis and, by so doing, to encourage and assist in the development of vitally needed recycling programs.
>
> For example, commodities transported for the purpose of disposal or to be used as landfill (a method of disposal) do not meet the criteria of our commodity definition (they are exempt from our economic regulation) nor would such commodities as nuclear or radioactive waste materials or such bulk waste materials as spent acids which are a part of a shipper's regular manufacturing process.

Id. at 103-08 (emphasis supplied). Since its rulemaking proceeding, the Commission has not changed its position with regard to non-radioactive hazardous wastes, although, as noted, it has continually vacillated on the need for economic regulation of radioactive wastes.

The Commission noted that the Nuclear Regulatory Commission and the Department of Transportation have primary jurisdiction over the safety aspects of the involved transportation, but found that its regulatory guidance was needed, not because of safety considerations, but "to ensure the availability of economical transportation of nuclear materials."Nuclear Diagnostic II, 131 M.C.C. at 581.

Such economic regulation, even if previously justified, is no longer the province of the ICC. The Motor Carrier Act of 1980, Pub.L.No. 96-296, 94 Stat. 793 (1980), clearly relies upon the competitive forces of

the marketplace to ensure that adequate transportation equipment is available. Moreover, in § 30(b) of the Motor Carrier Act, Congress delegated exclusively to the Secretary of the DOT the responsibility for determining the minimal levels of financial responsibility required for transporters of hazardous wastes by motor vehicle in interstate or intrastate commerce.

In this case, plaintiff contends that in *Nuclear Diagnostic II* the Commission extended its jurisdiction to regulate the transportation of all types of hazardous wastes, not just radioactive waste. Plaintiff contends that the Commission's conclusion "that the economic value of hazardous materials ... should not be the sole criterion for determining whether these commodities are 'property' subject to the general jurisdiction of the Commission," when considered in light of language distinguishing *Joray*, implies a desire by the Commission to regulate non-radioactive hazardous wastes having no economic value. *Nuclear Diagnostic II*, 131 M.C.C. at 580-81.

This is a strained interpretation of *Nuclear Diagnostic II*. Assuming that the Commission's Congressional mandate would encompass an extension of its jurisdiction to include regulation of the transportation of hazardous waste, the extent of such regulation is best determined in a rulemaking proceeding pursuant to 5 U.S.C. s 553. Furthermore, if the Commission had intended to expand its jurisdiction to include the regulation of hazardous wastes in the *Nuclear Diagnostic II* adjudicatory proceeding, it could, and should, have stated its intentions clearly. (Of course, in *Nuclear Diagnostic II*, such a statement could only be dictum). Here, however, where the Commission is on record after rulemaking and adjudicatory proceedings as having construed its jurisdiction not to include regulation of the transportation of all hazardous wastes, this court will not

> support an expansion of the Commission's
> jurisdiction by a broad reading of ambiguous
> language contained in one Commission decision.

*Id.* at 289-92.

Given that the ICC has been abolished and its remaining regulatory functions over motor carries transferred to the Department of Transportation (DOT), it is not clear what, if any, deference the opinions of the ICC indicating that garbage is not property should have on the question whether garbage is property under the current versions of 49 U.S.C. §§ 13501 & 14102(a) and 49 C.F.R. § 376.2(a).  Nevertheless, it appears that the DOT continues to view garbage not to be property subject to § 13501.  Defendant IESI points out that the DOT listed defendant Emerald Isle as "exempt for-hire" on the basis that it hauls garbage. *See Doc. 110, Exhibit 20.*

The plaintiffs argue that even though carriers of garbage may be exempt from economic regulations under the Act, they are not exempt from the safety regulations.  We agree with the plaintiffs that defendant IESI is subject to the safety provisions and regulations under the Act.  The question becomes whether the leasing provisions fall under the economic

provisions of the Act and regulations or under the safety
provisions of the Act and regulations.

49 U.S.C. § 13501 sets forth the jurisdiction of the
Secretary of the DOT and the Surface Transportation Board for
the provisions in Part B of Subtitle IV of Title 49, 49 U.S.C.
§§ 13101-14914.  The leasing provision of the Act in § 14102(a)
refers back to § 13501 and the definition of "authorized
carrier" in the leasing regulations refers to 49 U.S.C. § 13901
and § 13902 which in turn refer back to § 13501.  The leasing
regulations "only apply to the transportation of commodities
requiring carrier registration under the Surface Transportation
Board regulations." Kenworthy, *supra* at § 13.01[2]. *See also
Stanley v. Fiber Transport, Inc.*, 470 S.E.2d 767, (Ga.Ct.App.
1996)(holding that former ICC leasing regulations not
applicable to hauling bark because bark an exempt commodity).
*But see Vance Trucking Co. v. Canal Ins. Co.*, 249 F.Supp. 33,
(D.S.C. 1966)(holding that with two minor exceptions the
leasing provisions of Act and regulations in effect at that
time are applicable without regard to the commodity being
hauled), *aff'd*, 395 F.2d 391 (4th Cir. 1968).  Thus, we conclude
that the leasing regulations do not apply to defendant IESI

given that the Department treats garbage as not within its jurisdiction under § 13501.

Our conclusion that the leasing regulations do not apply to defendant IESI is further buttressed by the fact that the Department lists defendant IESI as a motor private carrier rather than a motor carrier. The Department's jurisdiction under 13501 is limited to motor carriers. The leasing provision of § 14102(a) refers to motor carriers and refers back to § 13501. Similarly the leasing regulations' definition of "authorized carrier" refers to motor carriers under the provisions of 49 U.S.C. § 13901 and § 13902, which provision in turn refers to § 13501. "These provisions do not purport to provide DOT with any authority to impose registration or security requirements on domestic motor private carriers." *Bilyou, supra*, 300 F.3d at 226 n.3.

For the above reasons, we conclude the leasing regulations do not apply to the relationship between defendant IESI and defendant Emerald Isle and its driver. Accordingly, defendant IESI is not vicariously liable under the Act or regulations for any negligence on the part of the truck driver. We next turn to the question whether defendant IESI is

25

vicariously liable under common law for any negligence on the part of the truck driver.

C. Common Law.

Defendant IESI argues that Emerald Isle was an independent contractor and that, therefore, it is not liable for any negligence on the part of Emerald Isle or its driver.

Under Pennsylvania law, a party is generally not liable for the negligence of an independent contractor.  There are limited exceptions to that rule, and the plaintiffs argue that, even if Emerald Isle was an independent contractor, defendant IESI is still liable for any negligence of Emerald Isle and its driver under Restatement (Second) of Torts § 428.

> The Restatement (Second) of Torts §428 provides:
>
> An individual or a corporation carrying on an activity which can be lawfully carried on only under a franchise granted by public authority and which involves an unreasonable risk of harm to others, is subject to liability for physical harm caused to such others by the negligence of a contractor employed to do work in carrying on the activity.

26

The Pennsylvania Supreme Court has not explicitly adopted § 428 of the Restatement. However, we predict that the Pennsylvania Supreme Court would adopt Restatement (Second) of Tort § 428 if faced with the issue. *See generally Longo v. Pennsylvania Electric Co.*, 618 F.Supp. 87, 90-91(W.D.Pa. 1985)(applying § 428 of the Restatement in a case decided under Pennsylvania law).

The plaintiffs argue that defendant IESI, as an authorized motor carrier with the United States DOT, had a franchise to engage in interstate commerce hauling and that, therefore, under § 428 it is liable for the negligence of Emerald Isle and its driver even if they are considered independent contractors.

Numerous cases have held that a common or contract carrier engaged in interstate commerce and regulated under the DOT (or former ICC) are responsible for the negligence of its subcontractors. For example, in *Venuto v. Robinson*, 118 F.2d 67 (3d Cir. 1941), the United States Court of Appeals for the Third Circuit predicted that New Jersey would adopt § 428 of the Restatement and concluded that the Restatement applied to a

common carrier engaging in interstate transportation by truck.
The Court reasoned:

> Inter-state motor carriage is now regulated by
> elaborate rules and regulations set out in the
> Motor Carrier Act of 1935 and the regulations
> thereunder.  The carriage of freight in high
> powered motor vehicles on public highways is
> certainly business attended with very
> considerable risk. The rule stated has been
> applied in cases against railroads to hold a
> lessor railroad liable even where the
> relationship has been lessor and lessee
> without even general control or direction by
> the lessor over the lessee.  The application
> of one employed by a common carrier by motor
> truck upon the public highways is an even
> clearer case.

*Id.* at 682-83 (footnote and citations omitted).

In *Serna v. Pettey Leach Trucking, Inc.*, 2 Cal.Rptr.3d
835 (Cal.Ct.App. 2003), the California Court of Appeals held
that the Restatement (Second) of Torts § 428 applied to a
interstate motor carrier even though that carrier was carrying
a commodity (poultry) that was exempt from the economic
regulations of the DOT.  However, in *Hill Brothers Chemical
Co. v. The Superior Ct.,* 20 Cal.Rptr.3d 530 (Cal.Ct.App. 2004),
the California Court of Appeals held that § 428 of the
Restatement did not apply in a case where the defendant was
licensed as a private motor carrier under California's Vehicle
Code.  That court reasoned:

The general rule is that one is not liable for the negligent acts of an independent contractor one hires. (*Fonseca v. County of Orange* (1972) 28 Cal.App.3d 361, 364, 104 Cal.Rptr. 566.) But exceptions to this rule have been well developed in California. Relying on section 428 of the Restatement of Torts, the Supreme Court ruled in *Taylor v. Oakland Scavenger Co.* (1941) 17 Cal.2d 594, 604, 110 P.2d 1044, that if "an individual or corporation undertakes to carry on an activity involving possible danger to the public under a license or franchise granted by public authority subject to certain obligations or liabilities imposed by the public authority, these liabilities may not be evaded by delegating performance to an independent contractor. The original contractor remains subject to liability for harm caused by the negligence of the independent contractor employed to do the work."

This rule of nondelegable duty was applied to a highway common carrier in *Eli v. Murphy* (1952) 39 Cal.2d 598, 248 P.2d 756. The Supreme Court ruled that "under both the common law and certain regulations of the [PUC], . . .a highway common carrier, could not delegate its duties to an independent contractor so as to escape liability for their negligent performance." The court explained: "a highway common carrier, is engaged in a 'business attended with very considerable risk' [citations], and the Legislature has subjected it and similar carriers to the full regulatory power of the [PUC] to protect the safety of the general public. [Citations.] The effectiveness of safety regulations is necessarily impaired if a carrier conducts its business by engaging independent contractors over whom it exercises no control. If by the same device it could escape liability for the negligent conduct of its contractors, not only would the incentive for careful supervision of

29

its business be reduced, but members of the public who are injured would be deprived of the financial responsibility of those who had been granted the privilege of conducting their business over the public highways. Accordingly, both to protect the public from financially irresponsible contractors, and to strengthen safety regulations, it is necessary to treat the carrier's duties as nondelegable. [Citations.] The Legislature has ··· classified highway common carriers ··· apart from others, and by so doing has indicated special concern with the safety of their operations ... Highway common carriers may not, therefore, insulate themselves from liability for negligence occurring in the conduct of their business by engaging independent contractors to transport freight for them." (*Id.* at pp. 599-601, 248 P.2d 756.)

The court in *Eli* noted the distinction between a carrier licensed as a public utility and one that operated under a permit: "'It is our conclusion that any trucking company, upon becoming a public utility under the Public Utility Act, should be expected to exhibit a high degree of performance in the field of safety and should expect to be required to observe rigid safety rules and regulations.' (General Order No. 99, 51 Cal. P.U.C. 66, 68-69.)" (*Eli v. Murphy, supra,* 39 Cal.2d at p. 601, 248 P.2d 756.)

A nondelegable duty was found to exist even when a PUC-licensed highway common carrier hires another PUC-licensed highway common carrier as an independent contractor to subhaul freight. (*Gamboa v. Conti Trucking, Inc.* (1993) 19 Cal.App.4th 663, 666-668, 23 Cal.Rptr.2d 564.) Thus, in *Serna v. Pettey Leach Trucking, Inc., supra,* 110 Cal.App.4th 1475, 2 Cal.Rptr.3d 835, an interstate carrier, licensed by the Surface Transportation Board (formerly the Interstate Commerce Commission), was found to have such a

nondelegable duty to the public and was
therefore found to have vicarious liability
for the negligent acts of an interstate
carrier it hired as an independent contractor
to transport a load it had been hired to haul.

But the courts have not applied the rule
of nondelegability to every highway carrier.
For example, in *Gaskill v. Calaveras Cement
Co.* (1951) 102 Cal.App.2d 120, 226 P.2d 633,
the Court of Appeal did not extend the *Taylor*
rule to a contract carrier who was operating
under a permit rather than a franchise. The
*Gaskill* court further distinguished the
circumstances from those in *Taylor* and under
section 428 of the Restatement of Torts,
finding that the activity of hauling a trailer
and semitrailer by tractor did not involve any
unreasonable risk of harm to others: "The
operation of any motor vehicle may be said to
involve some risk to others but the use of
[this independent contractor's] equipment
involved no more risk than that of any other."
(*Gaskill,* at p. 126, 226 P.2d 633.)

In *Gilbert v. Rogers* (1953) 117
Cal.App.2d 712, 256 P.2d 574, the issue before
the court was whether a radial highway common
carrier should be vicariously liable for the
negligence of a common carrier to whom it had
sublet a portion of a hauling contract. The
court reasoned that *Eli* should be applicable
to a radial common carrier because the rigs
used by them and by contract carriers to haul
freight were comparable to those used by
highway common carriers, and all classes of
carriers were licensed to transport freight on
the public highways by the PUC. (*Id.* at pp.
714-715, 256 P.2d 574.) But the court
nevertheless found that it was bound by the
distinction set forth in *Eli,* and held that
the radial highway common carrier had
"successfully insulated itself through the
medium of an independent contractor" because
both the carrier and the subhauler operated

31

pursuant to permits, not franchises. ( *Id.* at pp. 716-717, 256 P.2d 574.)

In any event, all of the cases in which a nondelegable duty has been imposed on a carrier have involved a "for-hire" carrier rather than a private carrier such as Hill Brothers. Hill Brothers argues that there is a critical difference between those who use the public highways as a business and those who use the highways only to transport their own products incidental to their business, and that the latter constitutes private carriage as a matter of right which is not subject to the same level of regulation as that of for-hire carriage. We agree.

. . .

Real parties contend that the fact that both private and for-hire carriers are regulated entities supports imposition of equal responsibilities on both. But it is clear that a greater standard of responsibility has been imposed upon those who hold themselves out to the public as being engaged in the business of transporting goods for compensation on the public highways. (See *Eli v. Murphy, supra,* 39 Cal.2d 598, 600-601, 248 P.2d 756; Civ.Code, § 2168 et seq.) Hill Brothers was neither licensed as a for-hire carrier, nor acting as a for-hire carrier when it hired an independent contractor to carry goods for the operation of its own chemical manufacturing business. Indeed, Hill Brothers was a consumer of the services of a for-hire carrier just as any other private member of the public might be.

Extension of the nondelegable duty rule to a member of the shipping public simply because the shipper is a private carrier and owns commercial vehicles it uses in its own business makes no sense at all. Such a rule would impose vicarious liability on the part

32

of a shipper for the negligence of an
independent contractor for matters over which
it exercises no control. We do not believe
that imposing such a duty is necessary to
address the other concerns expressed by the
court in *Eli*. It would certainly increase the
cost of doing business in California,
particularly the cost of insurance, and would
effectively spread risk to a party without
consideration of fault and without a sound
policy basis.

We therefore hold that a private carrier
is not vicariously liable for the negligent
acts of its independent contractor.

*Id.* at 534-36 (footnote omitted).

In the instant case, as discussed above, defendant IESI

was a registered with the DOT as a motor private carrier and

not as a motor carrier.  Thus, we conclude that the cases

holding that a common or contract motor carrier is liable for

the negligence of its subcontractors are not applicable in this

case.  Although defendant IESI had a DOT identification number

and was subject to the safety regulations of the DOT, as a

motor private carrier defendant IESI did not have a franchise

from the DOT.  Moreover, it is not genuinely in dispute that

defendant IESI owned the garbage that it transported and caused

to be transported to its landfill in Pennsylvania.  Thus,

defendant IESI was acting as a shipper and not a motor carrier

in transporting its garbage to its landfill.  Thus, we conclude

33

that as a motor private carrier defendant IESI was not liable under § 428 of the Restatement for the negligent acts of its independent contractors based on the fact that it had a DOT registration number.

The plaintiffs also argue that defendant IESI had a franchise with New York City to collect, transport, and dispose of trash generated within the city.  The record contains the contract between defendant IESI and New York City.  The plaintiff's, however, have not explained how that contract amounts to a franchise to defendant IESI from New York City. In any event, once trash was dumped at defendant IESI's transfer station, defendant IESI obtained title to that trash and the plaintiffs have not shown that defendant IESI had or needed a franchise from New York City to ship the trash to another location.  Accordingly, we conclude that defendant IESI is not liable under § 428 of the Restatement for any negligence on the part of Emerald Isle and its driver if Emerald Isle and its driver were independent contractors.

Next, we turn to the question of whether there is a reasonable inference to be drawn that Emerald Isle and its driver were independent contractors of defendant IESI.

34

"Under Pennsylvania law, when an injury is done by an "independent contractor," the person employing him is generally not responsible to the person injured." *Drexel v. Union Prescription Centers, Inc.*, 582 F.2d 781, 785 (3d Cir. 1978). "However, when the relationship between the parties is that of "master-servant" or "employer-employee," as distinguished from "independent contractor-contractee," the master or employer is vicariously liable for the servant's or employee's negligent acts committed withing the scope of his employment." *Id.* The difference between a servant or employee and an independent contractor revolves around the party's degree of control over how the work in question is done. The Pennsylvania Supreme Court has stated:

> The hallmark of an employee-employer relationship is that the employer not only controls the result of the work but has the right to direct the manner in which the work shall be accomplished; the hallmark of an independent contractee-contractor relationship is that the person engaged in the work has the exclusive control of the manner of performing it, being responsible only for the result.

*Green v. Independent Oil Co.*, 201 A.2d 207, 210 (Pa. 1964). "In ascertaining whether a person is an employee or an independent contractor, the basic inquiry is whether such person is subject to the alleged employer's control or right to

control with respect to his physical conduct in the performance
of the services for which he was engaged." *Id.* at 210 (footnote
omitted).  Although the right to control the manner in which
the work is to be done is the touchstone of the inquiry, a
number of other factors may be relevant to determining whether
a person was an employee or an independent contractor
including: whether the person has responsibility for results
only, the terms of any agreement between the parties, the
nature of the work to be done; the skill required for
performance, whether one employed is engaged in a distinct
occupation or business, which party supplies the tools, whether
payment is by time or by the job; whether the work is part of
the regular business of the employer, and the right to
terminate employment at any time. *Hammermill Paper Co. v. Rust
Engineering Co.,* 243 A.2d 389, 392 (Pa. 1968).  "Whether some
or all of these factors exist in any given situation is not
controlling." *Universal Am-Can, Ltd. v. Workers Compensation
Appeal Bd.,* 762 A.2d 328, 333 (Pa. 2000).  "Further, while each
factor is relevant, there are certain guidelines that have been
elevated to be dominant considerations." *Id.*  "[C]ontrol over
the work to be completed and the manner in which it is to be
performed are the primary factors in determining employee
status." *Id.*  "Moreover, it is the existence of the *right* to

36

control that is significant, irrespective of whether the control is actually exercised." *Id.*  If the facts are in dispute, it is the function of the jury to determine the precise nature of the relationship between the parties. *Green, supra,* 207 A.2d at 210.  "However, where the facts are not in dispute, the question of the relationship becomes one for determination by the court." *Id.*

The agreement between defendant IESI and Emerald Isle provides that Emerald Isle "will pick up MSW [municipal solid waste] from the Transfer Stations on each day it is authorized to operate and open for business and transport and deliver such MSW to the Landfills as directed by IESI." *Doc. 110, Exhibit 6.* The agreement further provides that Emerald Isle "shall utilize and have available sufficient tractor and trailer combinations in order to transport up to 500 tons of MSW per day." *Id.* Paragraph 4.7 of the agreement provides:

> This Agreement shall not in any manner be construed to create the relationship of principal and agent or a partnership or joint venture or of any association between IESI and TRANSPORTER [Emerald Isle].  The parties hereto agree to act as independent contractors and as such, except as otherwise specifically set forth in this Agreement, each party shall be liable for its own business operations, insurance, taxes, Permits, expenses and all other liabilities.  TRANSPORTER's employees

> assigned to perform work for IESI are solely
> the employees of TRANSPORTER and shall not be
> entitled to employee benefits normally
> associated with direct employment of
> individuals by IESI.

*Id.* Thus, the agreement between IESI and Emerald Isle

indicates that Emerald Isle is an independent contractor.

Although how the agreement characterizes the relationship

between defendants IESI and Emerald Isle is a relevant factor

in determining whether or not Emerald Isle was an independent

contractor, it is not determinative. *Urbano v. STAT Courier,*

*Inc.,* 878 A.2d 58, 62 (Pa.Super.Ct. 2005).


Defendant IESI points to the following factors as

indicating that Emerald Isle was an independent contractor: 1)

Emerald Isle owned its own tractor trailers and hired and paid

its own drivers; 2) IESI paid Emerald Isle by the ton to

transport MSW; 3) IESI did not employ or pay any of Emerald

Isle's drivers[1]; 4) there was no lease agreement between

Emerald Isle and IESI; 5) IESI did not direct the manner or

method by which the driver of the truck involved in the

accident in this case operated the tractor trailer; 6) the

---

1. The plaintiffs argue that pursuant to the Motor Safety Carrier
regulations IESI was the statutory employer of Emerald Isle and its
driver.  As discussed above, we have concluded otherwise.

driver had total control over the manner and method by which he operated the truck he was driving including what route to take, what speed to drive, what lanes to use, and when to pass other vehicles; 7) the driver was an experienced tractor trailer driver with a valid CDL; 8) Emerald Isle owned, possessed, and controlled the tractor trailer which the driver was driving; 9) Emerald Isle and its driver regularly maintained the tractor trailer that was involved in the accident; 10) the tractor trailer involved in the accident was operating pursuant to the DOT identification number of Emerald Isle and the identifying placards displayed on the tractor trailer were those of Emerald Isle and they did not contain the name of IESI or IESI's DOT identification number; and  11) IESI had no certificates, logos, insignias or markings on the tractor trailer. *See Doc. 132 at ¶¶7-16.*

On the other hand, the plaintiffs contend that Emerald Isle was not an independent contractor.[2]  The plaintiff's point to the following facts: 1) Emerald Isle hauled exclusively for

---

2. The plaintiffs' briefs do not contain a specific section in which they argue that Emerald Isle was not an independent contractor. However, the plaintiffs do make the argument that Emerald Isle was not an independent contractor. *See doc. 134 at 19-20 and doc. 135 at 19-20.*

IESI; 2) IESI controlled when Emerald Isle was to pick up the MSW; 3) IESI controlled and determined where Emerald Isle was to pick up the MSW; and 4) IESI controlled where Emerald Isle was to transport the MSW and the route Emerald Isle was to take.

There is a dispute between the parties about whether defendant IESI controlled the route Emerald Isle was to take in transporting the MSW to the landfills. The plaintiffs point to the testimony of the truck driver to support their assertion that IESI controlled the route taken. The driver testified that there is one route to each landfill and that he learned the route because the first time he picked up a load IESI gave him a paper with directions on how to get to the landfill. *Doc. 134, Exhibit J at* 153-55. The driver also testified that if there is a new landfill and you ask how to get there they give you a paper with directions. *Id.* at 153. Defendant IESI disputes that it controlled the route Emerald Isle was to take in transporting the MSW to the landfill. Of course, even though IESI provided directions to the landfill to the driver, that does not necessarily mean that IESI controlled the route Emerald Isle was to take. However, in considering whether to grant summary judgment all justifiable inferences are to be

40

drawn in favor of the non-moving party.  Thus, we conclude that based on the driver's testimony there is a genuine factual dispute about whether IESI controlled the route Emerald Isle was to take.  That dispute is material to the question whether Emerald Isle and its driver were independent contractors.

We also note that transportation of the MSW for disposal was a central function of IESI's business and of the agreement it had with New York.  Thus, Emerald Isle was performing a core function of IESI's business.  In conjunction with this factor, the fact that Emerald Isle hauled exclusively for IESI warrants a considerable inference of a significant degree of control in the hands of IESI and consequently of relatively little independence on the part of Emerald Isle. Although these factors in and of themselves do not necessarily lead to an inference that IESI controlled Emerald Isle and its driver to such an extent that they were not independent contractors, they are relevant considerations.  It is for the jury to decide whether or not Emerald Isle and its driver were independent contractors of IESI.  Accordingly, we will deny defendant IESI's request for summary judgment.

IV.   Order.

**IT IS ORDERED** that defendant IESI's motion (doc. 113) for reconsideration of the Order of January 25, 2005 is **GRANTED,** and that the Order (doc. 47) of January 25, 2005 denying  IESI's earlier motion for summary judgment and granting  plaintiff Wilson's motion for summary judgment on the issue of IESI's vicarious liability for any negligence on the part of the driver of the truck is **VACATED.   IT IS FURTHER ORDERED** that defendant IESI' motion (doc. 110) for summary judgment is **DENIED.**

_/s/ J. Andrew Smyser_
J. Andrew Smyser
Magistrate Judge

Dated:   July 28, 2006.